# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3388

_____

United States of America,         *
                                             *

       Plaintiff-Appellee,      *

                                         *     Appeal from the United States

           v.                   *     District Court for the

                                       *     District of Minnesota.

Michael Alan Mooney,       *

                                             *

       Defendant-Appellant.    *

_____

Submitted: November 20, 2003
Filed: March 28, 2005

_____

Before MURPHY, LAY, and BRIGHT, Circuit Judges.

_____

PER CURIAM.

Michael Alan Mooney was convicted by a jury of eight counts of mail fraud, four counts of securities fraud, and five counts of money laundering. The district court[1] sentenced him to 42 months, and Mooney appeals. He seeks a judgment of acquittal because of insufficient evidence, a new trial because of evidentiary error, or

_____

[1]The Honorable James M. Rosenbaum, Chief Judge, United States District Court for the District of Minnesota.

resentencing. We affirm Mooney's conviction but remand for further proceedings in respect to his sentence.[2]

Mooney was formerly vice president of underwriting for United Healthcare Corporation (United). United is one of the largest health care management service companies in the country, and its stock trades on the New York Stock Exchange. Mooney opened a margin account in 1990 at the brokerage house Recom which he used solely to invest in United stock. Recom extended him a line of credit equal to half the value of the securities he maintained in the account. If the value of his securities were to fall below half the account's total value, Recom would make a margin call. Mooney would then have to make a deposit to restore equity in the account or Recom could sell assets of his to restore the 50% margin.

As part of United's strategy to acquire health insurance companies, it approached privately owned MetraHealth (Metra) in early 1995 and entered into negotiations with it in February. At that time Metra provided health insurance to more individuals than United, and it also had a substantial indemnity business. If United were to succeed in acquiring Metra, it would become the largest health care services company in the United States. It would have more than 40 million people enrolled in a variety of health care programs, with projected annual revenue of more than $8 billion. Mooney received stock options from time to time as part of his compensation at United, and on April 13 he exercised his right to purchase 20,000 shares of United stock for $36,000. The market value on that day for that amount of stock was $917,500.

---

[2]An earlier opinion, filed on July 23, 2004, was vacated on August 6, 2004 by the en banc court, which has returned the case to the panel for further proceedings in light of United States v. Booker, 125 S. Ct. 738 (2005). The panel has revisited the case and now issues this revised opinion.

During the 1995 negotiations, United and Metra conducted due diligence inquiries which involved confidential meetings at the headquarters of each company. Mooney had attended many such meetings on behalf of United in the past, and he and other senior representatives of United went to Metra's Virginia headquarters on May 11, 1995 for due diligence meetings. They spent four days looking through Metra's financial records, membership projections, cost data, and confidential Book of Business. United's corporate counsel reminded the participants in the meetings not to trade in stock during the due diligence period and to protect the secrecy of the proceedings by referring to the proposed merger transaction as "Project Fjord" and to Metra as "Musky."

United has a written policy on insider trading which prohibits United employees from trading in its stock in two situations: (1) during the blackout period at the end of each quarter before the United earnings report is released, and (2) when an employee possesses material nonpublic information. The insider trading policy defines material nonpublic information as information that a reasonable investor would use in deciding whether to invest. It also states that information about proposed mergers and acquisitions by United is material. United's policy was frequently published in employee newsletters and mentioned in oral reminders at due diligence meetings.

After Mooney returned from the meetings at Metra's Virginia headquarters, he contacted his stockbroker on May 17, 1995 to sell the 20,000 shares of United common stock he had purchased in April. The sale cleared on May 24, and Mooney used part of the $775,500 proceeds to purchase call options in United stock. The call options were purchased between May 24 and June 14 for a total price of $258,283.03. They gave him the right to buy a total of 40,000 shares of United stock at $35 a share in the following months of September, December, and January. Both the sale of his United shares and his purchases of the United call options occurred before the end of the due diligence period in the Metra transaction.

Mooney subsequently sold his call options at a profit.[3]  On July 14, 1995 he sold the September options, and early in October he sold the December and January options.  His total return on these sales was $532,482.49, and between August 3 and November 20, 1995 he deposited $428,000 into an account he had at Firstar Bank. These deposits were made by five checks drawn on his account at Recom Securities.[4]

The first media mention of the acquisition appeared on June 21, 1995 in the New York Times, which reported that United was in advanced discussions with Metra. United issued a press release on the same day, confirming the ongoing discussions. The daily volume of trade in United shares increased markedly, and the stock price rose 5%.  On June 22 the Wall Street Journal reported speculation about United's approaching acquisition of Metra, and United common stock rose another 6%.  Then on June 26 United announced its agreement to acquire Metra for $1.65 billion in cash and stock.  On June 20, the day before the first national media story, United stock had traded at $40.125.  By July 15 the price was $44.50 a share, and by October 5 it was over $49.00.

Shortly after the public announcement of United's acquisition of Metra, stock market surveillance officials notified the Securities and Exchange Commission (SEC) about bullish positions taken in United call options prior to the announcement of the acquisition.  The SEC asked United to investigate whether Mooney had engaged in prohibited securities trading.  Although Mooney denied it to United's corporate

---

[3]The purchase and sale prices of Mooney's options to buy United stock in the three future months are shown below:

| Options for | Bought | Sold | |
|---|---|---|---|
| September | $63,004.75 (June 6) | $94,536.52 (July 14) | |
| December | $81,800.83 (June 14) | $139,298.57 (October 4) | |
| January | $113,477.45 (May 24, 26) | $298,647.40 (October 5) | |
| | $258,283.03 | $532,482.49 | (+$274,199.46) |

[4]Mooney deposited $138,000 on August 3; $70,000 on August 9; $20,000 on October 23; $100,000 on November 3; and $100,000 on November 20.

counsel, the SEC filed a civil action against him on August 2, 1999, alleging that the options were purchased while he had material nonpublic information regarding United's plan to acquire MetraHealth. The SEC sought an injunction, disgorgement of his gains, and a civil penalty. Shortly thereafter on August 9, United suspended Mooney for violating its insider trading policy. He later resigned. The SEC's civil action was stayed after he was indicted in this case.

The second superceding indictment alleged that Mooney knowingly devised and engaged in a scheme to defraud United and its shareholders through his May sale of United common stock and his subsequent purchase and sale of United call options, all while in possession of material nonpublic information concerning United's negotiations to acquire Metra. The indictment charged Mooney with eight counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 1346; four counts of securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff(a), and 17 C.F.R. § 240.10b-5; and five counts of money laundering in violation of 18 U.S.C. § 1957. The mail fraud counts referenced eight separate mailings of confirmation slips, for his May 17 sale of United common stock and for his subsequent call option transactions. The securities fraud counts covered his four separate purchases of call options. The money laundering counts were based on his deposits of five checks from Recom into his Firstar Bank account during August, October, and November 1995; the indictment alleged that these funds were derived from his securities and mail fraud.

Mooney was found guilty by a jury on all counts and required to forfeit $70,000. The district court denied his motions for judgment of acquittal or new trial and sentenced him to 42 months in prison and a $150,000 fine. Mooney appeals from the judgment, alleging insufficient evidence, abuse of discretion in an evidentiary ruling, and sentencing error.

In reviewing the sufficiency of the evidence in a case such as this, the evidence is considered in the light most favorable to the government, evidentiary conflicts are

-5-

resolved in its favor, and all reasonable inferences are drawn from the evidence in support of the jury's verdict. See United States v. Ramirez, 350 F.3d 780, 783 (8th Cir. 2003). We will reverse only if no reasonable jury could have found the accused guilty beyond a reasonable doubt. Id.

Mooney argues that the government did not prove a scheme to defraud beyond a reasonable doubt. The government alleged that Mooney acquired material, nonpublic information relating to United's acquisition of MetraHealth and that he breached the duty of trust he owed to United and its shareholders by purchasing the call options as part of a fraudulent scheme. Mooney's securities fraud charges alleged the use of manipulative and deceptive devices in connection with the purchase or sale of securities, see 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, and false and misleading statements willfully made. See 15 U.S.C. § 78ff(a). Fraudulent intent need not be proven directly, but can be inferred from the facts and circumstances surrounding the defendant's actions. See United States v. Flynn, 196 F.3d 927, 929 (8th Cir. 1999).

Mooney contends that there was insufficient evidence to prove that he used material nonpublic information in violation of the securities laws. Mooney argues that his case differs from the typical insider trading case. He claims that an inside trader ordinarily knows to a greater degree of certainty how the stock price will be affected by the release of nonpublic information. See, e.g., United States v. O'Hagan, 521 U.S. 642 (1997) (defendant knew that price of stock would increase after hostile tender offer announced). He argues that it was not certain that the United stock price would increase because of the merger with Metra. The legal test is not whether the price would certainly rise, however, but whether the inside information used was material. See Basic, Inc. v. Levinson, 485 U.S. 224, 236 (1988). A fact is material in the securities fraud context if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. Id. at 231-32.

There was more than enough evidence here for a reasonable jury to find that Mooney's inside information was material. He exercised employee stock options to purchase United stock on April 13 after negotiations with Metra had begun. As soon as he returned home from the May due diligence meetings, he began to purchase call options for United stock. The jury could infer that Mooney sought to capitalize on his nonpublic information and anticipated he could profit by purchasing call options that could later be sold at a higher price. Mooney also had access to information that the acquisition of Metra was likely to present new growth opportunities for United. Because of his participation in high level confidential meetings, Mooney knew that the due diligence review had not derailed negotiations and that United would only proceed with acquisitions that were expected to increase earnings. He also knew that United would grow considerably in size, programs, and projected revenue. All of this information would have been of interest to a reasonable investor, and the jury could have found a substantial likelihood that it would have been considered important in making investment decisions.

Mooney also contends that his transactions were not part of a fraudulent scheme, but rather began as a result of a margin call forcing him to sell some of his United common stock. His broker testified, however, that there was no record Mooney ever received a margin call, and other evidence showed that his account had not gone below the margin requirements before he sold his United shares in May. The broker also testified that Mooney's sale of United stock had had no significant effect on the margin status of his account. The trier of fact was entitled to find from this evidence that Mooney's May sale of United stock had nothing to do with a margin call.

Mooney also argues that any rational investor who observed the seasonal trends in the price of United stock would have made similar investment decisions. Whether or not that might be true, there was sufficient evidence for a reasonable jury to find Mooney's sale of common stock was part of a fraudulent scheme to use the sale

proceeds to purchase the United call options, that these transactions were based on his use of material nonpublic information, and that there was sufficient evidence on all elements of the securities fraud counts.

Mooney argues that the government did not prove beyond a reasonable doubt that the mails were used to carry out the fraudulent scheme. A mail fraud conviction under 18 U.S.C. § 1341 requires proof that the defendant voluntarily and intentionally devised or participated in a scheme to defraud, that he entered into the scheme with the intent to defraud, that he knew that it was reasonably foreseeable that the mails would be used, and that he used the mails in furtherance of the scheme. See United States v. Bearden, 265 F.3d 732, 736 (8th Cir. 2001).

Mooney contends that the only evidence of use of the mails was the mailing of confirmation slips to him by Recom after his May 17 sale of United stock and his subsequent purchases and sales of call options. Although he asserts that these mailings occurred after the alleged fraud, they fell within the time period of the fraudulent scheme alleged in the indictment, from "on or about February 1995 . . . continuing until October 6, 1995." The confirmation slips recorded transactions on May 24, 25, 30; June 7, 15; July 17; and October 5, 6, 1995. He argues further that he did not conceive these mailings to be part of the scheme's execution, citing Schmuck v. United States, 489 U.S. 705, 710 (1989). Mooney overlooks Schmuck's holding that the mailings need only be "incident to an essential part of the scheme" or a "step in [the] plot," id. at 710-11, and mailings that are in any way part of the execution of the scheme are sufficient to satisfy the mailing element of the offense. See id. at 713.

Experienced investors such as Mooney expect confirmation slips to confirm their transactions, and Mooney could have anticipated that his buy and sell orders would result in the mailing of confirmation slips. Confirmation slips are integral to an investor's contract relationship with his broker. See United States v. Naftalin, 606

-8-

F.2d 809, 811 (8th Cir. 1979). Because the broker's use of the mails is attributable to the investor's buy or sell order, it is sufficient to satisfy the requirement of use of the mails in furtherance of a fraudulent scheme. Id. at 811-12. These slips recorded the sale of Mooney's United stock and the number of call options he purchased and sold, at what price and date, their expiration dates, and details of their sale. The jury could reasonably find that these mailed records aided Mooney in his scheme to defraud. See United States v. O'Hagan, 139 F.3d 641, 652 (8th Cir. 1998). The jury was entitled to consider the confirmation slips in deciding whether the mails had been used as part of Mooney's fraudulent scheme, and we conclude there was sufficient evidence to satisfy the mailing element of the mail fraud counts.

Mooney also challenges the sufficiency of the evidence for his money laundering convictions under 18 U.S.C. § 1957. Money laundering is defined in the statute as knowingly engaging in, or attempting to engage in, a monetary transaction in criminally derived property that is valued at more than $10,000. Mooney argues that the money laundering counts must fail if the predicate offenses of securities fraud and mail fraud were not established, but as already discussed there was sufficient evidence to support his convictions for those offenses.

Mooney argues that there was insufficient evidence to prove that the funds deposited into his Firstar Bank account were proceeds of insider trading. The evidence showed that the deposits consisted of five withdrawals from the Recom account Mooney used for transactions in United stock. He contends that there was enough United common stock or "clean money" in the account to cover the deposit checks. There was thus insufficient evidence he argues, to show that the deposits were from proceeds of the sale of his call options or "dirty money." The government contends that the issue is unreviewable because Mooney did not raise this commingled funds theory in his motion for acquittal. See United States v. Olano, 507 U.S. 725, 733-34 (1993) (timely assertion necessary to obtain appellate review). The point is well taken, but we note in any event that the government need not trace each

dollar to a criminal source to prove a violation of 18 U.S.C. § 1957. See United States v. Hetherington, 256 F.3d 788, 794 (8th Cir. 2001) (citing United States v. Pennington, 168 F.3d 1060, 1066 (8th Cir. 1999)); see also United States v. Ross, 210 F.3d 916, 919-21 (8th Cir. 2000) (same rule adopted for 18 U.S.C. § 1956).

Mooney's theory would allow wrongdoers to evade prosecution for money laundering simply by commingling criminal proceeds with legitimate funds. Moreover, the jury could reasonably find from the evidence that Mooney was only able to withdraw the funds from his Recom account without going below his margin limit because the account contained the proceeds from the sale of his call options. We conclude that there was sufficient evidence to support Mooney's convictions for illegal monetary transactions.

Mooney also argues that the district court abused its discretion by denying his motion in limine. Before trial he asked the court to rule that his 1986 state tax conviction could not be used to impeach him if he were to testify. The court's denial of the motion caused him not to testify he says, because he feared he would be prejudiced by mention of his conviction in front of the jury. A trial court's evidentiary rulings are generally reviewed for abuse of discretion, see, e.g., United States v. King, 351 F.3d 859, 864 (8th Cir. 2003), but Mooney's issue is unreviewable because he did not testify. See Luce v. United States, 469 U.S. 38, 43 (1984). Nevertheless, the court's decision to allow impeachment by use of his tax conviction was not an abuse of discretion. See United States v. Carter, 528 F.2d 844, 847 (8th Cir. 1975). Mooney has not shown that he is entitled to a new trial.

Mooney's sentencing arguments on appeal focused on the application of a sentencing enhancement for the amount the district court found to be the gain resulting from his offenses. See United States Sentencing Guidelines Manual [U.S.S.G.] § 2B1.4 (2002). He contends that the district court erred in its interpretation of § 2B1.4 and in its finding that the gain from his insider trading was

$274,199.46. That amount was determined to be the gain Mooney realized by the sale of his United call options for $532,482.49 after purchasing them for $257,283.03.

In sentencing Mooney on August 21, 2002, the district court applied the 1994 guidelines because those in effect in 2002 would have resulted in a higher sentencing range for the amount of gain found to have resulted from his offenses. See U.S.S.G. § 1B1.11(b)(1). Mooney does not challenge the court's use of the 1994 guidelines, and § 2B1.4 is identical in both versions except for the use of gender neutral language in 2002. The district court applied the guideline grouping rules which call for grouping of offenses which involve substantially the same harm. See U.S.S.G. § 3D1.3. Mooney's securities and mail fraud convictions were grouped under U.S.S.G. §§ 3D1.2(b) and (d), since they involved the same criminal objective. They were then grouped with his convictions for laundering the fraudulent proceeds. See U.S.S.G. § 3D1.2(c). Since the money laundering convictions had the highest offense level of the grouped offenses, they supplied the base offense level of 17. See U.S.S.G. § 3D1.3(a). Two levels were added for Mooney's knowledge that the proceeds were from a fraudulent scheme. See U.S.S.G. § 2S1.2(b)(1)(B) (1994).

The final adjustment to Mooney's base offense level was an enhancement of two levels for engaging in monetary transactions involving between $200,000 and $350,000 in illegal proceeds. See U.S.S.G. §§ 2S1.1(b)(2)(C), 2S1.2(b)(2) (1994). This enhancement is the subject of Mooney's sentencing appeal. The illegal proceeds involved in his money laundering were those derived from his insider trading offenses, and the district court found the gain from those offenses to be $274,199.46 under U.S.S.G. § 2B1.4. With a total offense level of 21 and a criminal history score of I, Mooney's sentencing range was 37 - 46 months. The court sentenced him in the middle of the range to 42 months.

The district court found that the gain resulting from Mooney's offenses was the total amount he gained from his illegal purchase and sale of United call options, but

Mooney argues his gain should not be determined from the proceeds he received on their sale. The formula he urges would use instead the increase in the market value of the call options in the period before his inside information became public and was absorbed by the market. Mooney claims that the market would have reasonably absorbed his inside information by June 28, just two days after United announced its Metra acquisition, and that the information would have been reflected in the market value of his call options on that date. His brief puts that value at $309,750,[5] from which he subtracts the purchase price of $258,283.03 to arrive at a gain figure of $50,467.47. The proceeds of the sales in July and October should not be a factor he says because the sales occurred after June 28, his estimated date for absorption of the inside information into the market. His proposed gain figure would result in a guideline range of 24 - 30 months.

Mooney argues that the sentencing guideline term "gain resulting from the offense" is not clear and that a market absorption approach should be borrowed from civil insider trading cases to interpret the guideline. Cf. 15 U.S.C. § 78u-1(f) (using trading price of the security a reasonable period after public dissemination of the nonpublic information). He points to SEC v. MacDonald, 699 F.2d 47, 53-55 (1st Cir. 1983) (en banc), a civil case holding that defrauded sellers could recover the amount they lost before they could have reasonably obtained access to the material nonpublic information, a formula characterized as remedial in nature. Id. at 54; see also id. at 55 (Coffin, C.J., dissenting). Accord United States v. Perry, 152 F.3d 900, 903-04 (8th Cir. 1998) (disgorgement is a civil sanction serving nonpunitive goals).[6]

_____

[5]This appears to be a typographical error; we assume $308,750 is intended.

[6]The SEC's civil fraud case against Mooney was stayed when the United States decided to charge him with criminal fraud and money laundering; his formula for gain in this criminal case would apply the same type of disgorgement remedy sought in the SEC's civil case.

The government responds that the appropriate focus is on the amount of gain which Mooney realized from his fraudulent transactions. It notes that the official commentary for the insider trading guideline expressly disapproves of any attempt to measure the severity of the offense in terms of victim losses, and it says that different standards are intended for the criminal sentencing guidelines than for civil disgorgement actions. In the civil context the amount to be disgorged is limited to victim losses because using total gain could result in an unjust windfall for private victims. The government points out that Mooney's proposed standard to measure gain is inherently speculative and would require the sentencing court to identify the point at which material nonpublic information is fully assimilated by the market. That would involve extensive factfinding, and in the present case it would be difficult to say when, if ever, the market had fully assimilated all of the nonpublic information Mooney possessed.

After Blakely v. Washington, 124 S. Ct. 2531 (2004), was decided, Mooney moved to file a supplemental brief, arguing that his sentence violated his Sixth Amendment right to have the amount of gain be determined by a jury. In the now vacated panel decision filed on July 23, 2004, two judges agreed with the district court's interpretation of § 2B1.4 but two members of the panel held the federal sentencing guidelines wholly unconstitutional under Blakely and only advisory.

On January 12, 2005, the Supreme Court issued its opinion in United States v. Booker, 125 S. Ct. 738 (2005), which decided how the Sixth Amendment impacts the federal guidelines. Since Mooney's case was on direct appeal at the time Booker was decided, it is relevant to his sentencing appeal. Id. at 769. In Booker, the Court held that the rule of Apprendi v. New Jersey, 530 U.S. 466 (2000), applies to the guidelines so that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum [mandatory guideline range] authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." 125 S. Ct. at 756. The

Court further held that two provisions of the statute creating the federal guideline system must be excised to make it compatible with the Sixth Amendment: 18 U.S.C. § 3553(b)(1) which made the guidelines mandatory and § 3742(e) which made their application subject to de novo review. Booker, 125 S. Ct. at 764. The constitutional remedy chosen by the Court was to make the guidelines advisory and their application subject to review for reasonableness. See id. at 764-65. Nevertheless, federal courts still "must consult [the] Guidelines and take them into account when sentencing," Id. at 767. Sentencing courts should also consider the sentencing factors created by Congress in 18 U.S.C. § 3553(a). See id. at 765.

Sentencing remains a court function under Booker. See id. at 760. Judicial fact finding is permitted as long as it is understood that the guidelines are not mandatory. See id. at 764. Although the court must consult the guidelines, it is not obligated to sentence according to them, and a sentence imposed in the exercise of discretion will be upheld if reasonable. Id. at 767. Reasonableness may be demonstrated by a court's consideration of the guidelines, relevant conduct, and statutory sentencing factors. See id. at 764-65; see also United States v. Yahnke, 395 F.3d 823, 825.

Under the remedial approach set out by Justice Breyer for cases in which there is an apparent Sixth Amendment violation, the first question in applying "ordinary prudential doctrines" is whether the defendant raised the issue below. Booker, 125 S. Ct. at 769. It is not clear from the record before us whether Mooney asked the district court at trial to submit the issue of gain to the jury[7] or whether he raised a

_____

[7]Although no fact issue on the gain resulting from Mooney's offense was submitted to the jury, the basis for his other sentencing enhancement was. In respect to one of the money laundering counts, the jury made a finding beyond a reasonable doubt that Mooney had knowledge that the money involved was derived from his fraudulent scheme. Mooney has never raised any issue about this enhancement on his appeal.

-14-

constitutional issue at his sentencing. We have reviewed the record and have not found any indication that such an argument was made, but the district court is in a better position to determine what happened at trial. Accordingly, Mooney's sentence should be remanded to the district court for further proceedings in light of Booker.

In summary, we conclude that Mooney is not entitled to prevail on any of his arguments for judgment of acquittal or new trial and we affirm his conviction, but we remand his sentence to the district court for further proceedings consistent with Booker and with the power to modify the sentence if warranted.

_____